**EAST HIGH SCHOOL PRISM CLUB, an unincorporated association; East High School Rainbow Club, an unincorporated association; Jessica R. Cohen, a minor, by and through mother and next friend, Judy Cohen; and Margaret Hinckley, a minor, by and through her mother and next friend, Judy Hinckley, Plaintiffs,**

v.

**Cynthia SEIDEL, Assistant Superintendent of Salt Lake City School District, in her official capacity, Defendant.**

No. 2:00CV311C.

United States District Court,
D. Utah,
Central Division.

April 26, 2000.

---

Richard A Van Wagoner, Salt Lake City, UT, for Plaintiffs.

Dan R. Larsen, Salt Lake City, UT, for Defendants.

## ORDER

CAMPBELL, District Judge.

This matter comes before the court on Plaintiffs' Motion for preliminary injunctive relief prohibiting the Defendant from denying the PRISM Club, Jessica Cohen, and Margaret Hinckley access to the limited forum created for curriculum-related student clubs at East High School.[1] Plaintiffs claim that they fit within the club-approval standards as articulated by the School District and argue that the official in charge of reviewing their student club application either misapplied the review standards or impermissibly added an additional standard. As set forth by Plaintiffs, the only issue before the court is whether Defendant correctly applied the standards governing access to the limited forum in its denial of the PRISM Club application.

*Background*

### A. IGDA Policy

On February 20, 1996, the Board of Education of the Salt Lake City School District adopted a formal written policy concerning student organizations:

> The Board of Education of Salt Lake City School District desires to promote and advance curriculum related student clubs. However, the Board does not allow or permit student groups or organizations not *directly related to the curriculum* to organize or meet on school property. It is the express decision of the Board of Education of Salt Lake

---

1. The parties assign different names to the limited forum existing at East High School. Plaintiffs' memorandum refers to the limited forum as a "limited designated public forum," while Defendant's opposition brief refers to the "limited closed forum." Both parties agree that the forum is "limited" because it is available only to student groups. (*See* Plaintiffs' Memorandum in Opposition to Preliminary Injunction at 15 n. 2; Defendant's Memorandum in Support of Preliminary Injunction at 6.) The correct terminology of the forum makes little difference for purposes of the pending motion.

City School District not to allow a "limited open forum" as that is defined by the Federal Equal Access Act, 20 U.S.C. § 4701.

("IGDA Policy," attached as Exhibit B to Clark's Declaration) (emphasis added). School administrators have implemented this written policy through an application process that requires prior review and approval of every student club or group that seeks to meet on school premises during non-instructional time and use school facilities to promote its activities.

Defendant Cynthia L. Seidel is the District official charged with regulating access to this forum by reviewing student club applications. According to Seidel, to determine whether a club is directly related to the curriculum, she looks "at the courses that are listed on the application," the "course descriptions that are associated with those course titles," and the "disclosure statements attached to the application." (Seidel Deposition at 31, attached as Exhibit A to Clark's Declaration.)[2] She approves the club if (1) it appears that the subject matter of the group relates to the subject matter of a course and (2) the group activities provide "reinforcement, application, [extension,] and practice of curricular content." (*Id.* at 99.) Seidel explained the second aspect by explaining that she approves the application if, on the face of the club application, the club "takes the subject matter, gives the students a chance to review it, to see it in real life, to practice what they've learned in a hands-on type of setting, or to see it in the real world, those types of connections." (*Id.* at 100) This "directly related to the curriculum" standard, as written in the IGDA Policy and expressed by Seidel, is adopted from the Supreme Court decision in *Bd. of Educ. of Westside Community Schools v.*

*Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990).

On August 27, 1998, Seidel distributed a memorandum about the IGDA Policy to all Secondary School Principals. Plaintiffs submitted the memorandum as Seidel's explanation of the standards applied by the School Board in limiting access to the forum. Seidel's memorandum, while apparently not meant as an exhaustive explanation of the IGDA standard, highlights that "[o]nly approved, curriculum-related clubs may be sponsored by the school." (Seidel Memorandum, dated August 27, 1998, attached as Exhibit E to Clark's Declaration) (hereinafter "Seidel Memorandum"). According to the memorandum, the School Board policy,

provides for sponsorship of only those student clubs that are directly related to the curriculum offered at the school. A student club is curriculum related if:

1. The subject matter of the group is actually taught or soon will be taught in a regular course; or

2. The subject matter of the group concerns the body of courses as a whole; or

3. Participation in the group is required for a particular course, or results in academic credit.

Additionally, the actual activities of the student club must be related to the curriculum.

(*Id.*)

Plaintiffs also submitted the deposition of Darline P. Robles, Salt Lake City School District Superintendent.[3] During the deposition, she was asked her understanding of the IGDA Policy:

Q. (By [Plaintiff Counsel] Ms. Kendell) Does the current policy impose any additional requirements other than

---

2. Seidel's deposition was taken on December 16, 1998, in conjunction with the related case, *East High Gay/Straight Alliance, et al. v. Board of Educ. of Salt Lake City School Dist., et al.,* Civil No. 2:98CV193J, 1999 WL 1390255 (D.Utah 1999).

3. Ms. Robles was deposed in the *East High Gay/Straight Alliance* matter on January 29, 1999.

that the subject matter of the club be directly related—

A. [ (By Robles) ] The policy is very clear, it must be curriculum related.

Q. And that's essentially all the policy requires?

A. Right.

. . .

Q. Anybody that you know of that's applied any additional criteria beyond curriculum relatedness?

A. There may be—and again I don't know this. But I've heard considerations where a school would say that a club wants to add a service component to it. But those would probably have to be approved with Ms. Seidel. Because they're only conversations that I've heard. Whether it's been done or not, I don't know.

(Robles Deposition at 76–77, attached as Exhibit D to Clark's Declaration.)

The application form used by the School District to evaluate proposed clubs mirrors the standards as set out in the written IGDA standards, as explained by Seidel in deposition and memorandum form, and as outlined by Superintendent Robles during her deposition. On the top of the first page of the form, students are instructed "The Salt Lake City School District Board of Education Policy IGDA provides for sponsorship of Student Clubs that are directly related to the curriculum offered in the school at which the Club is organized." (*See, e.g.*, PRISM Application, attached as Exhibit J to Clark's Declaration) (hereinafter "PRISM Application"). Under the heading "Relationship to School Curriculum," the form reads:

> In order to qualify as a Student Club that is directly related to the curriculum, the club must meet one or more of the following criteria. Check all that apply.
>
> The subject matter of the club is actually taught or soon will be taught in a regular course offered at the school. The subject matter of the club concerns the body of courses as a whole.
>
> Participation in the club is required for a particular course.
>
> Participation in the club results in academic credit.

(*Id.*)

The two-page application form provides space for the club's statement of purpose, a listing of "approved course(s) that provide the curricular basis for the Student Club," "additional comments and rationale for approval," and a listing of the activities of the proposed club. (*Id.*) Applicants are told to attach teacher disclosure statements describing the relevant course content to the application form. At the end of the form, under the heading "Educational Services Review," is space for Seidel to either approve the application (by checking a box labeled "Approved—Direct relationship to curriculum demonstrated") or deny the application (by checking a box labeled "Denied—Non-curricular student activity"). (*See id.*)

### B. Prism Club Application

Plaintiffs are members of the PRISM ("People Recognizing Important Social Movements") Club. On PRISM's application form under the heading "Additional comments and rationale for approval," the club is described, in relevant part, as follows:

> This club is about American history, government, law and sociology. We want to talk about democracy, civil rights, equality, discrimination and diversity.
>
> . . .
>
> Our club is not about "advocating homosexuality," promoting a partisan platform, or discussing sexual behavior. We agree with the school district's nondiscrimination policies and with the United States Constitution that all students should have an equal voice and be treated with equal respect.

(*Id.*) The application form lists the following proposed activities: "letter writing to public officials, keeping up and debating current events, tutoring, guest speakers, field trips, reviewing historical events, reports on influential GLBT [Gay, Lesbian, Bi-sexual, and Transgendered] persons and events, [and] group discussions." (*Id.*)

The description of the club as contained in the club charter is repeated, in relevant part, below:

> We ... would like to initiate the "PRISM Club" in order to expand and enhance our study and understanding of American history and government, law and social institutions, which are topics covered in the U.S. History, American Government and Sociology courses currently taught here at East High School, and to gain hands-on experience in applying the concepts and skills taught in those courses.
>
> . . .
>
> The club will serve as a prism through which historical and current events, institutions and culture can be viewed in terms of the impact, experience and contributions of gays and lesbians.
>
> There is an ongoing dialogue in our community, our state and our country about such issues as whether gays and lesbians should be allowed to serve openly in the military and in organizations such as the Boy Scouts, to marry, to adopt children and form families, and in general to enjoy the full rights of citizenship. That dialogue is directly related to many of the topics covered in the U.S. History, American Government, and Sociology courses at East High. Pursuing that dialogue in the PRISM Club will allow us to put what is taught in those courses into practice.
>
> . . .
>
> We feel the PRISM club will benefit East High School students and members of the community by giving interested students an opportunity to enhance their knowledge of American history, government, law and social institutions and to

gain a more concrete understanding of how they affect the real lives of gay and lesbian people.

(*Id.*)

According to the application, PRISM is related to the school curriculum because "[t]he subject matter of the club is actually taught or soon will be taught in a regular course offered at the school." (*Id.*) Specifically, the PRISM application claims a relationship to U.S. History, American Government and Law, and Sociology.

In a letter dated March 1, 2000, Seidel denied PRISM's application. According to the letter,

> the organizing subject matter of the club narrows to "the impact, experience, and contributions of gays and lesbians" in historical and current events, institutions, and culture. This subject matter is not taught in the courses you cite. After careful review of your application, I am unable to approve this club as a curriculum-related club.

(Seidel Letter, attached as Exhibit L to Clark's Declaration.) During oral argument, Seidel testified that this "no narrowing of subject matter" rule has never been written down and that she never expressed this rule in any previous deposition.

### Standards for Injunctive Relief

█ To obtain injunctive relief, a party must establish that: (1) it will likely prevail on the merits of the litigation; (2) it will suffer irreparable injury unless an injunction is issued; (3) its threatened injury outweighs any harm the proposed injunction may cause to the opposing party; and (4) an injunction, if issued, would not be adverse to the public interest. *See Elam Const., Inc. v. Regional Transp. Dist.* 129 F.3d 1343, 1346–47 (10th Cir.1997).

### Analysis

A. *Do Plaintiffs Have a Substantial Likelihood of Success on the Merits?*

█ When the law controlling a case's outcome favors the movant, courts deem

**1244**

the first factor the one that "requires the most detailed analysis." *See id.* at 1347. It is a fundamental tenant of First Amendment jurisprudence that the State may not discriminate against speech on the basis of its viewpoint. *See Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Within constitutionally-permissible guidelines, however, a school board may legally limit access to its facilities. *See id.,* citing *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 390, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Board of Education v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). Consequently, a school board may establish and apply constitutionally-permissible standards to deny after-school student-sponsored clubs access to school premises and other facilities (such as bulletin boards, the school PA system, and school yearbook recognition). Once the school makes its facilities available for some after-school clubs and not others, however, it is imperative that the school "respect the lawful boundaries it has itself set" by communicating coherent standards in some way to potential speakers and consistently and fairly applying its club approval standards. *See Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510.

These are both constitutional requirements and commonsense conclusions. It is not difficult to see why some articulation of the "forum-limiting" standard is required. In *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 758, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), for example, the Supreme Court held that an absence of express standards makes it far too easy for officials to use "post hoc rationalizations" and "shifting or illegitimate criteria" to justify their behavior, and thus make it difficult for courts to determine whether an official has engaged in viewpoint discrimination. *Id.; Summum v. Callaghan,* 130 F.3d 906, 920 (10th Cir.1997). For the same reason, a coherent standard is required so that potential speakers (and courts, if necessary) can predict with some

certainty what speech the standards allow and what speech the standards forbid. *See, e.g., AIDS Action Committee of Massachusetts, Inc. v. Massachusetts Bay Transportation Authority, et al.,* 42 F.3d 1, 12 (1st Cir.1994) (upholding a district court's injunction on the basis that the "[p]olicy in its present form is scarcely coherent [and] invites the very discrimination that occurred in this case . . . .").

■ During oral argument, defense counsel argued that the "communication of a coherent standard" requirement (as expressed by the Tenth Circuit in *Summum*) was inapplicable to this case. *See Summum,* 130 F.3d at 919 ("On remand, the district court must carefully scrutinize the validity of the County's stated reasons for refusing access to the [forum] to ensure that the County's justifications are not simply 'post hoc rationalizations' or a pretext for viewpoint discrimination."). The facts of *Summum* are different from the facts in the present case. The claim in *Summum* involved an action against a county based on the county's refusal to allow a church to erect a religious display on county property; here, the case deals with the First Amendment in the context of a school. Defendant is correct that schools play an important and unique role in the American landscape: "the nature of [a school's] power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). But school children do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). While the underlying question (of where to draw the constitutional boundaries) is, perhaps, more complicated, there is no doubt that Defendant is required to communicate a coherent standard and consistently apply that standard.

In the instant case, Plaintiffs argue that Seidel has either misapplied the IGDA standards or impermissibly added an additional standard when reviewing PRISM's application. Specifically, Plaintiffs stress that the PRISM application falls within the previously expressed standards and argue that the basis of Seidel's denial of PRISM's application—because the "organizing subject matter of the club narrows to" a particular group (gays and lesbians)—is an entirely new standard, never before articulated by the school board, Seidel or any other person, and never before used by Seidel during her review of student club applications. Defendant argues that although this standard is unwritten, it is implicit in the policy underlying the IGDA Policy and has been used consistently throughout Ms. Seidel's tenure.

The only issues before the court, then, are whether Seidel's interpretation of the standard for determining whether a club is directly-related to the curriculum has been previously articulated and whether that interpretation has been applied consistently.

According to Seidel, a student club is curriculum-related if "[t]he subject matter of the group is actually taught ... in a regular course." (Seidel Memorandum.) A review of the course objectives, attached to the club application, demonstrates that the subject matter proposed to be discussed at PRISM Club meetings is actually taught in courses at East High School. As noted above, PRISM's application claims a relationship with three courses that are currently taught at East High School: Sociology, U.S. History, and Government and Politics.

The relevant course objectives of Sociology are:

a. develop the ability to look at the social world around them more objectively, instead of viewing it as they want to see it or as others might want them to see it.

b. gain insight into how society is structured and how it functions.

c. become aware of some of the problems of our society, and have a chance to consider possible solutions to these problems.

d. identify and use problem-solving techniques to analyze social problems

...

f. participate in group discussion and debate.

....

(PRISM Application.) Two United States History course outlines are attached to the club application. The first U.S. History class lists its objectives as:

a. to gain a greater appreciation of our American heritage and what it means to be a responsible American citizen;

b. to understand and appreciate American culture and what each ethnic group has contributed and sacrificed to make the United States what it is today;

c. to leave the value of freedom and how the United States Constitution and the Bill of Rights help insure a free society

d. to improve critical thinking and decision making skills

e. to examine controversial issues and events objectively through information presented from differing points of view

f. to gain a greater tolerance and respect for individuals with differing points of view and personal values.

(*Id.*) The second U.S. History class lists the following relevant course objectives:

4. recognize that cultural and social diversity have always existed in America.

...

6. recognize and evaluate the varied influences on American culture and society.

(*Id.*) The relevant course objective of Advanced Placement Government and Politics is: "show an understanding of issues involving civil rights and civil liberties." (*Id.*)

Based on the documentation provided, the court concludes that the subject matter of the PRISM club is "actually taught ... in a regular course," as required for approval under the IGDA Policy. (*See* Seidel Memorandum.) Defendant argues that this analysis is insufficient: in addition to a requirement that the subject matter of the club actually be taught in a class, curriculum-relatedness also requires that the subject matter of the club not be too narrow.

In fact, the standard Defendant actually applied in reviewing PRISM's application is not obvious. Throughout oral argument, the parties spoke about a "no narrowing of the subject matter" rule and, alternatively, a "no narrowing of a club's viewpoint" rule.[4] Bob Pliley, Principal of East High School, seemed to make reference to both: according to his letter to Seidel, Pliley was opposed to the club application because it appeared to "endorse a limited, specialized position or format. By my lights, our responsibility is to be inclusive, not exclusive." (Pliley Letter, attached as Exhibit K to Clark's Declaration.) Siedel's letter (denying the PRISM application) is equally unclear as to which rule was applied, but seems to refer to a "no narrowing of the subject matter" concept: "the organizing subject matter of the club narrows to [a particular subject]. This subject matter is not taught in the course you cite." (Seidel Letter.) Defendant's brief and oral argument focused on a "no narrowing of a club's viewpoint"

standard. (*See, e.g.,* Defendant's Memorandum in Opposition to Preliminary Injunction at 8.) Seidel's difficulty during her testimony given at oral argument to articulate a distinction between "content narrowing" and "viewpoint narrowing" further confused the issue and points to a lack of coherence in District policy.[5] In the final analysis, all that can be confidently said is that Defendant believes there to be a "no narrowing" rule in the IGDA Policy. Whether that rule is meant to refer to subject matter, viewpoint, or both is entirely unclear.

That is no doubt that PRISM narrows the subject matter of the courses to which it claims a relationship. For example, since the PRISM application does not mention reading or writing activities (though the group's letter writing activities could potentially fit the latter classification), the club does not appear to relate to two course objectives of Sociology: "(e) experience a variety of reading materials containing a variety of views and opinions" and "(g) express opinion and understanding of areas of study through writing, using the mechanics of writing acceptably." (PRISM Application.) Similarly, PRISM's application does not relate to some of the objectives of the U.S. History class:

1. demonstrate an ability to work with and interpret maps;

2. show an understanding of charts, diagrams, cartoons, and time lines;

3. demonstrate a knowledge of American political principles and practices;

. . .

5. recognize America's changing world role in the twentieth century.

---

4. The latter rule is an apparent reference to Justice Steven's dissent in *Mergens:* "[a]n extracurricular student organization is 'noncurriculum related' if it has as its purpose (or as part of its purpose) the advocacy of partisan theological, political, or ethical views." *Mergens,* 496 U.S. at 276, 110 S.Ct. 2356 (Stevens, J., dissenting).

5. Even assuming a "no narrowing of a club's viewpoint" rule exists, it is not at all clear that such a rule would even make sense. All clubs are, in a sense, viewpoint exclusive: French clubs are "viewed" from the perspective of French-speaking students; science clubs are "viewed" from the perspective of science-oriented students; all student clubs are "viewed" from the perspective of Utah high school students.

(*Id.*) Finally, PRISM's application relates only to one of seven course objectives of the Advanced Placement Government and Politics class.[6] To repeat a metaphor articulated by defense counsel during oral argument, the proposed PRISM Club is best visualized as a "subject matter" subset within a larger "total curriculum subject matter" circle.

It is less clear that PRISM narrows to a particular viewpoint. According to the Defendant, since PRISM is "obviously political," denial of its application is justified. (Defendant's Memorandum in Opposition to Preliminary Injunction at 42–43.) In fact, the PRISM application explicitly states "[o]ur club is not about 'advocating homosexuality,' [or] promoting a partisan platform...." (PRISM Application.) Despite the Defendant's prediction of how the club will actually operate, the face of the application emphasizes in unambiguous language that PRISM is *not* "obviously political." Defendant's evidence of PRISM's "viewpoint exclusive focusing" rests on one sentence in the club's application: "The club will serve as a prism through which historical and current events, institutions and culture can be viewed in terms of the impact, experience and contributions of gays and lesbians." (*Id.*) The court understands this sentence to limit the subject matter of the club, but leave open the viewpoint of its members. The application does not say, for example, that club members will view things "from the perceptive of gays and lesbians to the exclusion of all other viewpoints."[7] Club membership is not limited to gays and lesbians, and there is nothing in the club application that would even indicate that only pro-gay viewpoints would be tolerated in club meetings.

With this background in mind, the court turns to the issue of whether a "no narrowing" rule is implicit in the policy underlying the IGDA Policy and (if so) whether that rule has been consistently applied since the adoption of the IGDA Policy.

### 1. *Implicit Rule Analysis*

During oral argument, Defendant maintained that although the articulated standards do not explicitly contain a "no narrowing" rule, such a rule is implicit in the written IGDA Policy. A fair reading of the IGDA Policy reveals no such implicit limitation. The standards expressed in the written policy, explained by Seidel and Robels, and mirrored in the club application form, give no hint of a "no narrowing" rule. Seidel's memorandum itself contains the reasonable definition of "curriculum-related": "A student club is curriculum related if ... [t]he subject matter of the group is actually taught or soon will be taught in a regular course." (Seidel Memorandum.) If the school board wished to include a "no narrowing" rule, it could have easily added such a sentence to the IGDA Policy.

The court's conclusion that a "no narrowing" rule cannot reasonably be inferred from the written rules has, in fact, been borne out in practice. As repeated above, when School Superintendent Robels was asked whether there was any "other" limitation on approval of clubs, she responded that she did not know of any other rules. If the School Superintendent is unaware of the existence of a "no narrowing" rule, it seems entirely unreasonable to expect any potential student speaker to know of the rule's existence. Based on the information provided to the court, it is unreasonable to imply a "no narrowing" rule to the IGDA Policy.

---

6. All told, a fair reading of PRISM's application shows that the subject matter outlined in the application relates to approximately fourteen out of twenty-six class objectives. The application appears to relate to all six class objectives of one of the U.S. History classes.

7. In addition, Seidel's denial of PRISM's application does not mention this "no viewpoint exclusive club" rule. Instead, the letter denies the application because the subject matter is too narrow.

In support of its argument, Defendant argues that the IGDA Policy explicitly states that the School District does not intend "to allow a 'limited open forum' as that is defined by the Federal Equal Access Act, 20 U.S.C. § 4701." (IGDA Policy.) Defendant argues that acceptance of Plaintiffs' argument would obviate this express intent to keep the forum closed by requiring approval of nearly all proposed clubs, even those only tangentially-related to a curriculum class. (*See, e.g.,* Plaintiffs' Memorandum in Opposition to Preliminary Injunction at 24.) The court disagrees. Even without an implicit "no narrowing" rule, not all speakers would be allowed access to the forum because the IGDA Policy contains express limitations: the subject matter of the club must still relate to curriculum classes and the application must be endorsed by a club advisor. Because there are limitations, not all club applications will be approved and the forum is not entirely open.

For purposes of this motion, the court concludes that "curriculum-related" means what Seidel says it means: the subject matter of the group must actually be taught in an academic class. There is no requirement (explicit or implicit) that the club address *the entire* subject matter of the class from every conceivable viewpoint.

### 2. Consistent Application

Despite the absence of a well-articulated "no narrowing" rule, the Defendant argues that consistent application of such a rule in the past establishes the existence of the rule. Assuming, arguendo, that such a standard is implicit in the IGDA Policy, the court considers whether it has been consistently applied. In considering this question, both parties turn to Seidel's treatment of prior club applications.

Defendant directs the court's attention to Seidel's October 25, 1999 denials of a Women's Studies Club application ("WSC") and a Students Against Drunk Driving Club application ("SADD").[8] According to its application, WSC was proposed for the following purposes:

> To create more awareness of the contribution made by women in the arts, sciences, and in athletics. Our focus for the first year will be on world literature.
>
> . . .
>
> Activities will revolve around reading and discussing literature written by, about, and for women. We will keep dialogic [sic] journals based on our readings.
>
> . . . .

(WSC Application, attached as Exhibit 1 to Defendant's Supplemental Documents.) Seidel denied the club application by checking the box labeled "Denied—Non-curricular student activity," without comment. (*See id.*) The WSC application claims a relationship with a class entitled "Alternative English 10," then taught at West High School. A disclosure statement, attached to the application describes the course as follows: "This course will provide instruction and practice in the language arts skills of reading, writing, listening, speaking, and viewing per the state core curriculum. Through world literature we will explore the issues of coming of age, families, belonging, dreams and quests, love and romance." (*Id.*) Assuming that some of the authors discussed in the English course are female, there is a "fit" between the subject matter of the club and the subject matter of the course.

The SADD application claims that the club would:

> Promote many functions designed to raise awareness of the adverse effects of alcohol. SADD would also have an emphasis on preventative measure and provide alternatives to drinking-related activities. With the combined effort of each member, the overall goal of this

---

**8.** Both applications deal with West High School instead of East High School. The distinction is irrelevant since review of club applications at both schools are purportedly governed by the same IGDA standards.

organization is to educate students and reach out to those who have effected by this destructive force.

(SADD Application, Attached as Exhibit 3 to Defendant's Supplemental Documents.) The SADD application claims a relationship to a Health class, then taught at West High School. Among other things, Health Class is designed for the following objectives:

1. Allow students to develop the skills which are vital in make [sic] informed decisions concerning their health

2. Help students recognize the value and necessity of desirable health practices

3. Create a desire to be involved in public health issues in the community

. . . .

(*Id.*) A fair reading of the SADD application reveals a "fit" between the subject matter of the club and the subject matter of the related curriculum course. As with WSC, Seidel denied the SADD application (without comment) because she deemed it a "non-curricular student activity."

Based on a review of WSC's and SADD's applications, Defendant is correct that the club applications were denied despite "fits" between the clubs and identified course objectives. The "no narrowing of subject matter" rule appears to have been applied in these two cases. The court finds no reason to think that a "no narrowing of the club's viewpoint" rule was applied in either case, however. Like the PRISM application, the WSC and SADD applications make no explicit reference to any particular viewpoint.

Plaintiffs direct the court's attention to four club applications that Seidel previously approved.[9] Perhaps most relevant to Plaintiffs' argument is the East Polyne-

sian Club, approved by Seidel on November 3, 1999. According to its application, the club is designed to "provide academic services, support, cultural awareness plus enriching activities thus enhancing the student's high school experience." (Polynesian Club Application, attached as Exhibit H to Clark's Declaration.) Under the heading "Additional comments and rationale for approval," the application states "It will be held with parential [sic] involvement. The Tongan class will allow the student to better understand the Polynesian community and its relationship with each other." (*Id.*)[10] Proposed club activities include aloha socials, guest speakers, a luau, a tutoring program "provided by Gov. Levitt's office of Polynesian Affairs," arts and craft demonstrations, and traditional Polynesian dancing. (*See id.*)

The Polynesian Club claims a relationship with a Tongan Language class, then taught at East High School. The course objectives of Tongan II are, in their entirely:

> again be re-introduced to the importance of the Tongan alphabet, its proper oral pronunciation, its formal usage, sentence structure, grammar, and the "ulungaga faka-Tonga"

> read, sing, and write in Tongan and translate from English to Tongan and vise [sic]

> learn to view the Tongan language, Culture, and People as one of respect, families, beauty, pride, and an abundance of joy.

(*Id.*) Seidel approved the club because she found a direct relationship to the curriculum. (*See id.*)

It appears that the "no narrowing" rule was not applied in review of this club's application. The Polynesian Club application focuses on Polynesia, and (apparently,

---

**9.** The court discusses only two of these clubs.

**10.** This appears to be a misstatement. The court understands this to mean that the *club,*

not the *class,* will allow the student to better understand the Polynesian community.

though not mentioned specifically in the application) Tongan-speaking Polynesians, to the exclusion of other Tongan-speakers world-wide. The Polynesian club application does not say anything about reading Tongan texts or translating them to English (or vice-versa). In fact, the application appears to propose a club which would be quite different from a "Tongan Language Club."[11] A fair reading of the club application is that the club highlights but one aspect of the Tongan Class (i.e., the Polynesian Culture) to the exclusion of other class objectives.

The CHARABANC Humanities Club is designed to "provide an opportunity for students to follow up on the topics learned in their humanities and geography classes to further their own knowledge...." (CHARABANC Application, attached as Exhibit F to Clark's Declaration.) According to the club charter, the club is designed to provide a chance to "view[ ] the sights and peoples of the new and old world through the windows available in Salt Lake City and surrounding areas." (*Id.*) Proposed activities include visits to art museums, traveling exhibits, symphony concerts, ballets, modern dance concerts, ethnic and cultural fairs, and dining at ethnic restaurants. (*See id.*) The CHARABANC application claims a relationship to World Geography and Humanities, courses then taught at East High School. Seidel approved this club, finding that there was a direct relationship to the curriculum.

A fair reading of CHARABANC's application reveals that the subject matter of the club "fits" within all of the objectives of the Humanities class. The proposed club does not relate to some of the objectives of World Geography, however. Spe-

cifically, it is difficult to discern a connection between the club's application and the following objectives of World Geography:

1. Read and interpret maps, charts, and graphs

. . .

3. Describe similarities and differences of major world religions

4. Describe similarities and differences of major world governments

5. Describe the influences of migration

. . . .

(*Id.*) As with the Polynesian Club, it is fair to say that the "no narrowing" rule was not applied in Seidel's review of this club's application. In conclusion, a "no narrowing" rule has not been consistently applied in reviewing student club proposals.

Defendant attempts to differentiate the Polynesian Club and CHARBANC Club by arguing that those clubs are organized on curricular subject matter and, unlike the PRISM club, are not viewpoint exclusive. As discussed above, even if PRISM is meant to be "viewpoint exclusive" (which, by the face of its application, it is not), a "no narrowing of the club's viewpoint" rule is difficult (if not impossible) to discern from the written IGDA standards or as those standards have been explained by Seidel during deposition or by memorandum.[12] Additionally, it is difficult to draw any meaningful distinction among these three clubs: if the PRISM club is "viewpoint exclusive" because it focuses on gay and lesbian issues, the Polynesian club is "viewpoint exclusive" because it focuses on Polynesian culture and the CHARABANC club is "viewpoint exclusive" because it views its subject matter through "windows available in Salt Lake City...." (CHARABANC Application.)

---

11. Indeed, the court is not persuaded by Defendant's argument that the Polynesian Club is theoretically the same as a French Club. According to its application, the Polynesian Club could best be analogized to a Paris Club, claiming a relationship to a French Class.

12. The argument (articulated at oral argument) that a potential speaker would know of this rule because of IGDA's reference to *Mergens* is without merit. In order to find this rule in the written standards, a student would have to read the IGDA Policy, read *Mergens* and conclude that Seidel would apply the dissent's rule.

The court concludes that the District has never explicitly articulated a "no narrowing" rule, and the court can find no reason to infer such a rule from current policy guidelines. Even if such a rule could be inferred, it has not been consistently applied. For purposes of this motion, the court finds that the District has failed to "respect the lawful boundaries it has itself set." *See Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510. Based on the above, the court concludes that there is a substantial likelihood that Plaintiffs will eventually succeed on the merits.

*B. Will Denial of Injunctive Relief Result in Plaintiffs' Irreparable Injury?*

The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Community Communications Company, Inc. v. City of Boulder, Colorado*, 660 F.2d 1370, 1376 (10th Cir.1981) (citing *Elrod* favorably); 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948 (1973) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

*C. Does the Injury Outweigh the Potential Damage to the Opposing Party?*

During oral argument, Defendant argued that acceptance of Plaintiffs' arguments would lead to an open forum, thereby obviating the previously articulated closed forum policy. As discussed above, the court does not reach the same conclusion: the forum is still limited (to student clubs) and it is still not open (clubs must be related to the curriculum and endorsed by a club advisor). The only potential damage to Defendant is that an injunction will require the District to consistently apply the standard it itself established to limit access to its forum. On the Plaintiffs' side is an injury of the highest magnitude. The court has little trouble deciding that the balance favors Plaintiffs.

*D. Will the Injunction be Adverse to the Public Interest?*

Defendant argues that the public interest is best served by leaving implementation of the IGDA Policy in the hands of the District and avoiding judicial "micro-management." (*See* Defendant's Memorandum in Opposition to Preliminary Injunction at 19.) This is no doubt true, but only so long as District policy is applied in a constitutionally-permissibly manner. Hence, while Defendant may be correct that courts should not "divest local school districts of their power to shape the educational environment of their schools," a federal court cannot avoid its duty to uphold the Constitution. (*Id.*)

The court concludes that the issuance of an injunction in this case would not be adverse to the public interest. Indeed, assuming the Plaintiffs' First Amendment rights are violated by current school board policy (or lack thereof), the harm of not granting injunctive relief harms the public interest. *See AIDS Action Committee of Massachusetts, Inc.*, 42 F.3d at 12 ("First Amendment litigation of this kind has consequences that go far beyond the individual parties."); *Beerheide v. Zavaras*, 997 F.Supp. 1405 (D.Colo.1998) ("enforcement of the First Amendment ... promotes every citizen's fundamental right ...").

In summary, the court concludes that Plaintiffs are entitled to injunctive relief and the court GRANTS Plaintiffs' motion.