Yvonne CAUDILLO, by next friend
Brenda CAUDILLO, et al.,
Plaintiffs,

v.

LUBBOCK INDEPENDENT SCHOOL
DISTRICT, et al., Defendants.

No. Civ.A.5:03–CV–165–C.

United States District Court,
N.D. Texas,
Lubbock Division.

March 3, 2004.

Brian F. Chase, Lambda Legal Defense & Education Fund, Carla M. Burke, Chris J. Panatier, Kevin D. McHargue, Monty Wade Sullivan, Scott L. Frost, Baron & Budd, Dallas, TX, for Plaintiffs.

Ann Manning, Michael R. McCauley, Jr., McWhorter, Cobb & Johnson, Lubbock, TX, for Defendants.

### MEMORANDUM OPINION

CUMMINGS, District Judge.

On this day the Court considered both the Plaintiffs' and the Defendants' respective Motions for Summary Judgment filed on October 20, 2003. Defendants filed their Response on November 7, 2003, and the Plaintiffs filed their Response on November 9, 2003. After considering all the evidence and arguments, the Court is of the opinion that Defendants' Motion should be **GRANTED** and Plaintiffs' Motion should be **DENIED**.

## I.

### BACKGROUND

On July 8, 2003, Plaintiffs filed their complaint in this Court. The Plaintiffs in this case are (1) Yvonne Caudillo, by next friend, Brenda Caudillo; (2) Mirah Epstein Curzer, by next friend, Howard Curzer; and (3) Lubbock High School Gay Straight Alliance, an unincorporated association. Defendants filed their Original Answers on July 30, 2003. The Defendants are (1) Lubbock Independent School District ("LISD"); (2) Wayne Havens, in his official capacity as Acting Superintendent of LISD ("Defendant Havens"); (3) Dr. Jack Clemmons, individually ("Defendant Clemmons");[1] and (4) Fred Hardin, in his official capacity as Assistant Superintendent for Secondary Schools of Lubbock ("Defendant Hardin"). On August 4, 2003, Defendant Clemmons filed his Motion for Summary Judgment and Brief in Support based on qualified immunity. Plaintiffs filed a Response on September 29, 2003. After obtaining leave from this Court, Defendant Clemmons filed a Reply on October 1, 2003. This Court granted Defendant Clemmons' motion and dismissed him from this lawsuit in an order and judgment dated November 10, 2003. As stated above, the parties' respective motions and responses relating to summary judgment on the non-qualified immunity issues are now before this Court and are the subject of this order.[2]

Although the parties have not been able to agree upon all facts, in their Joint Sta-

---

1. Dr. Jack Clemmons is no longer a party in this lawsuit pursuant to this Court's order of November 10, 2003.

2. In their Response, Defendants objected to Plaintiffs' summary judgment evidence because Plaintiffs "have not sworn or certified certain documents requiring the same, nor

556

tus Report filed August 14, 2003, the parties agreed upon and stipulated to the following facts:

LISD, by and through its Board of Trustees, adopted a limited open forum by virtue of its Board Policy FNAB (LEGAL). By doing so, the Equal Access Act, 20 U.S.C. § 4071(a) *et seq.*, applies. LISD has adopted an abstinence policy applying to all matters concerning sexual activity. On or about September 9, 2002, Joseph Schottland ("Schottland"), an LISD faculty member at Lubbock High School ("LHS"), wrote a letter to Defendant Hardin, the then Assistant Superintendent for Secondary Education, seeking permission for the Gay and Proud Youth Group ("GAP Youth") to post notices at LHS about their off-campus meetings. GAP Youth is now known as Lubbock Gay Straight Alliance ("LGSA").

On or about September 12, 2002, GAP Youth members Ricky Waite ("Waite") and Rene Caudillo ("Caudillo"), both LHS seniors who have since graduated, wrote to Roy Grimes, Board Trustee, for permission to advertise their group via the posting of fliers in the halls of LHS as well as making announcements over the school's PA system. On or about September 20, 2002, Waite and Caudillo, along with some of their relatives, made a presentation to Hardin requesting permission to post their fliers in the school's hallways and to make announcements over the school's PA system. On or about November 6, 2002, Waite and Caudillo made a formal written

request to Defendants and the members of the School Board asking to be placed on the November 14, 2002 Board agenda so that they could request permission to post fliers. The letter included a list of goals, description of meeting, services to the community, and further included a paragraph as follows:

A FEW WORDS:

We are not in any way, "recruiting." Anyone who attends our functions does so of their own free will. We will use diplomatic tactics to provide guidance to youth. We will not be the ones making the decision about their sexuality and we will be working with other organizations, councilors [sic], etc. to provide the best help possible.

In addition, the stated goals in the letter included:

(1) Provide guidance to youth who come to us to the best of our ability and when we cannot provide help[,] relay them to those who can.
(2) Educate those willing about non-heterosexuals.
(3) Improve the relationship between heterosexuals and homosexuals.
(4) Help the community.
(5) Increase rights given to non-heterosexuals.
(6) Educate willing youth about safe sex, AIDS, hatred, etc.
(7) Enhance the relationship between youth and their families.

On November 6, 2002, Havens, then Deputy Superintendent, corresponded with

have they attached them to any affidavits swearing to or certifying such documents." The Court finds that Plaintiffs have not sworn to, certified, or attached to any affidavit swearing to or certifying the documents referenced in Defendants' objection; therefore, Defendants' objection is sustained and the Court finds that the documents are not proper summary judgment evidence before this Court. In their Response, Plaintiffs objected

to Defendants' summary judgment evidence of "approximately 500 web pages, none of which were written, created or maintained by the Plaintiffs," as being irrelevant and inadmissible under Federal Rules of Evidence 401 and 402. This Court finds the material to be highly relevant under Federal Rule of Evidence 401 and thus admissible under Rule 402. Thus, Plaintiffs' objection is overruled.

Waite, Caudillo, and the GAP Youth founders acknowledging their request to address the Board of Trustees. They were placed on the November 14, 2002 agenda. On November 14, 2002, Waite addressed the Board of Trustees. The Board of Trustees took no action; however, GAP Youth was not allowed to post their fliers. On November 20, 2002, Schottland wrote Mark Griffin, President of the LISD Board of Trustees, expressing his concern with this decision. Schottland suggested that LISD allow the students to post notices in the school hallways, but that the students not have use of the school's PA system. On or about December 19, 2002, Waite made a request to Doyle Vogler ("Vogler"), Principal of LHS, to allow GAP Youth to meet on campus. Vogler denied the request. On or about December 19, 2002, Waite also made a written request to Defendant Hardin requesting that GAP Youth be allowed to meet on campus. Thereafter, Defendant Hardin phoned Waite and responded that the request was denied.

LGSA, formally GAP Youth, is a non-curriculum-related group.[3] At this time, the status of posting the fliers, making announcements, and meeting on the LHS campus remains the same for LGSA. LISD receives federal financial assistance. LISD maintains a policy that "the District shall not prohibit student expression solely because other students, teachers, administrators, or parents may disagree with its content."

Defendants submit additional "uncontroverted facts." Defendants further submit that principal Vogler reviewed GAP Youth's website prior to denying their requests. Defendants submit that Hardin also reviewed the website of the group prior to making his decision that the content and material were inappropriate for students and the LISD campuses. LISD's secondary schools were made up of minors from as young as twelve to seventeen years of age. Defendants allege that Hardin denied GAP Youth's request based upon the LISD abstinence-only policy, federal law, State law, and the well-being and disruption exceptions to the Equal Access Act. Defendants further submit that Vogler and Hardin again reviewed the website prior to denying the group's later request in December of 2002 to meet on campus. Hardin made the decision to deny the request after reviewing the website, which still contained links to material with sexual content. The GAP Youth website was created by Rene Caudillo. The fliers that the group requested to post on the Lubbock High School campus contained the address for GAP Youth's website. Caudillo was responsible for the content of the website. *See* Caudillo Dep. p. 135. The GAP Youth website included direct button links to *www.gay.com* and later to *www.youthresource.com*. The *www.gay.com* content was accessible when the group requested to post its fliers. Topics on the website included "New Sexy Gay Game Pics" and "Favorite Questions." The latter included articles on (1) Why Am I Having Erection Problems?; (2) How Safe is Oral Sex?; (3) The Truth About Barebacking; (4) First Time With Anal Sex; (5) Kissing and Mutual Masturbation; (6) How Safe Are Rimming and Fingering?; (7) The Lowdown on Anal Warts. Caudillo admitted in his deposition testimony that such content was inappropriate for a school campus.[4] *See* Caudillo Dep. at

---

3. At some point after Hardin phoned Waite and told him the request was denied, the group changed its name from Gay and Proud Youth to Lubbock Gay–Straight Alliance. No evidence was provided as to the exact date the name was changed, although the Court infers from the deposition testimony of Caudillo that the likely time frame was in the spring of 2003.

4. Other similar types of topics and paragraphs were revealed in Caudillo's deposition

92. Caudillo further testified that the *www.gay.com* content was removed from its website some time after requesting to post the fliers and use the P.A. system; however, the *www.youthresource.com* content was still on the web page when Hardin reviewed the website in January of 2003 before making his final decision denying the GAP Youth group permission to meet on campus.

At the time of the requests, Texas law banned sexual acts between homosexuals. *See* Tex. Penal Code Ann. § 21.06 (Vernon 2003). Texas law also makes it a crime for minors to engage in sexual acts if they are of the same sex, or if they are of opposite sex and more than three years apart in age. *See* Tex. Penal Code Ann. § 21.11(a) (Vernon 2003).

This lawsuit was brought for alleged violations of the Equal Access Act, 20 U.S.C. § 4071 *et seq.*, and of the First Amendment pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988. Suit was also brought for declaratory relief pursuant to 28 U.S.C. § 2201–02.

## II.

### STANDARD

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. 2505. In making its determination, the court must draw all justifiable inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505.

 Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the non-movant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED. R. CIV. P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428 (5th Cir.1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993). Affidavits, or portions thereof, that are not based on personal knowledge or that are based merely on information and belief cannot be considered in deciding a motion for summary judgment. *Richardson v. Oldham*, 12 F.3d 1373, 1378–79 (5th Cir.1994). To defeat a properly supported motion for summary judgment, the non-movant must present more than a mere scintilla of evidence. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. Rather,

---

to have been available through the GAP Youth website, such as How to Use a Condom; Discuss Safer Sex with Your Partner (including detailed instructions on condom use); Unprotected Oral Sex; and Safer Sex: How? (including vagina/penis intercourse, anal intercourse, manual sex, and sharing a sex toy). *See* Caudillo Dep. pp. 44–58; Def.App. tab 16.

Also included in the content is discussion of alcohol use and "shooting up" drugs. The Court will not discuss the specifics detailed under these headings; Defendants' Appendix and the record properly contain the explicit details. Caudillo also admits in his deposition testimony that such material discusses sexual activity in detail. *Id.* at p. 58.

the non-movant must present sufficient evidence upon which a jury could reasonably find in the non-movant's favor. *Id.* The court will not, "in the absence of any proof, assume that the non-moving party could or would prove the necessary facts." *McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as modified,* 70 F.3d 26 (5th Cir. 1995).

▮▮▮▮ A complete failure to prove an essential element of a non-moving party's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548. However, it is not enough to make conclusory allegations that the opposing party has no evidence. *Id.* at 326, 106 S.Ct. 2548; *Ashe v. Corley,* 992 F.2d 540, 543–44 (5th Cir.1993). The moving party must identify the specific issue or issues on which it claims the opposing party has no supporting evidence and demonstrate that absence. For example, a moving party may offer admissions and responses to discovery to prove there is no genuine issue of material fact. *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir.1986).

▮▮▮▮ Finally, in reviewing the summary judgment evidence, "Rule 56 does not impose upon this Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998). Nor does a court have a duty to search the record for triable issues. *Id.* Rather, the Court need rely only on those portions of the submitted documents to which the non-moving party directs the Court's attention. *Id.* The party opposing summary judgment is required to articulate the precise manner in which the evidence supports his or her claim. *Id.* Moreover, Local Rule 56.5(c) expressly requires that a party filing an appendix "must include in its brief citations to each page of the appendix that supports each assertion that the party makes concerning the summary judgment evidence." A party may not rely upon "unsubstantiated assertions" as competent summary judgment evidence. *Id.* at 458.

## III.

## DISCUSSION

The legal issues before this Court are whether Defendants violated Plaintiffs' First Amendment rights or the Equal Access Act when Defendants denied Plaintiffs' request to post and distribute fliers, use the P.A. system, and be recognized as a student group with rights to meet on campus. This case presents an issue of first impression for this Court and for this circuit. This Court has been unable to locate, nor have the parties directed this Court to, any case law directly on point in this circuit dealing with a gay-straight student group desiring to be recognized and to meet on a public secondary school campus.[5]

---

**5.** Plaintiffs cite to *East High Gay/Straight Alliance v. Bd. of Educ.*, 81 F.Supp.2d 1166 (D.Utah 1999); *East High Sch. Prism Club v. Seidel,* 95 F.Supp.2d 1239 (D.Utah 2000); *Colin v. Orange Unified Sch. Dist.*, 83 F.Supp.2d 1135 (C.D.Cal.2000); *Gay–Straight Alliance Network v. Visalia Unified Sch. Dist.*, 262 F.Supp.2d 1088 (E.D.Cal.2001); *Franklin Cent. Gay/Straight Alliance v. Franklin Tp. Cmty. Sch. Corp.*, 2002 WL 32097530 (S.D.Ind.2002); *Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ.*, 258 F.Supp.2d 667 (E.D.Ky.2003). Upon review, the Court finds this handful of cases to be distinguishable because this Court was unable to find that any of the cases involved a school that maintained an abstinence-only policy and banned any discussion of sexual activity on its campuses. Although some of the cited cases raised the exception to the EAA for maintaining order and discipline, the cases lacked any meaningful discussion of the "well-being exception" to the EAA. *But see Boyd County,* 258 F.Supp.2d at 688–91 (mentioning the well-being of the students but limiting its discussion to maintaining order and discipline). Moreover, none of the cases involved a group

Defendants submit that the laws of Texas show the State's compelling interest in preventing groups based upon sex, sexual content, and sexual activity from gaining recognition in public schools. The Defendants further allege that the State has a compelling interest in protecting the students' mental and physical health and well-being. Finally, Defendants submit that the State has a compelling interest in protecting students from teen pregnancy, sexually transmitted diseases, and the harms associated with sexual activity and minors. The Defendants allege that the State's compelling interest is even stronger in instances where the sexual activity is illegal. Finally, Defendants argue that any group that is based upon sexuality, whether heterosexual or homosexual, is inappropriate in the secondary school setting.

**FIRST AMENDMENT**

Plaintiffs' claims under § 1983 alleging violations of their First Amendment rights must be analyzed under the "limited public forum" methodology. Under First Amendment analysis, schools that open their doors for groups to meet have created "limited public forums" (not to be confused with "limited open forums" under the EAA). *See Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 242–43, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (distinguishing between the two different standards). When the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). Limited public forums allow a school to limit the subject-matter topics that will be discussed, but not the individual viewpoints on the allowed subject matter. *Perry Educ. Ass'n v. Perry Local*

*Educators' Ass'n*, 460 U.S. 37, 45–49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). "To create a forum of this type, the government must intend to make the property 'generally available' ... to a class of speakers." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998).

The State may be justified "in reserving [its forum] for certain groups or for the discussion of certain topics" and it has the right to limit subject matter to those subjects proper for which the forum was reserved. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). However, a school may not limit viewpoints on particular subjects that it has allowed in a limited public forum. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Moreover, the subject-matter restriction must be "reasonable in light of the purpose served by the forum." *Id.* at 806, 105 S.Ct. 3439. The forum at LISD is reserved for student groups. The conclusion that only students are allowed to use LISD facilities for posting fliers and holding group meetings is supported by Plaintiff Caudillo's testimony that, after graduation from LHS, he would no longer be allowed to attend meetings of LGSA held on campus. *See* Caudillo Dep. p. 135 at In. 18–19; *see also* 20 U.S.C. § 4071(c)(5) (stating that under the EAA "nonschool persons may not ... regularly attend activities of student groups").

Plaintiffs claim that Defendants' actions were viewpoint exclusions. In order to be actionable as a viewpoint exclusion, the viewpoint excluded must itself be germane to the permissible subject matter of the forum. *Cornelius*, 473 U.S.

wishing to promote, through the school's P.A. system or by way of fliers on the bulletin boards and in the hallways, its website that

provided access to obscene, indecent, and lewd sexual material.

at 806, 105 S.Ct. 3439. Here, the entire subject matter of sexual activity was banned. Restrictions to the subject matter are allowed if reasonable in light of the purpose served by the forum and as long as the restrictions are "not an effort to suppress expression merely because officials oppose the speaker's view." *See Arkansas Educ. Television Comm'n,* 523 U.S. at 678, 118 S.Ct. 1633. Affidavits and deposition testimony indicate that Defendants would have clearly denied *any* group access to school facilities if such a group had chosen to violate the school's policy regarding discussion of sexual activity and the group was, at its core, based upon sexual activity. The distinction of whether the material is homosexual or heterosexual in nature is irrelevant.

Plaintiffs further assert, in an effort to show viewpoint discrimination, that no other groups have been subjected to website investigations. However, Defendant Hardin further stated in his deposition that the reason he reviewed GAP Youth's website was because of their request to post fliers, which contained the website address. The Court finds that Defendants' reasons for reviewing the website were reasonable under the circumstances and nondiscriminatory. The content of the GAP Youth's website is one of the reasons given by the Defendants for denying the group's requests. Plaintiffs assert that the offending material was merely linked to the website. The purpose of linking one site to another is to provide access to the site. In this case, Caudillo, by specifically creating the direct button links as part of the GAP Youth's website to *www.gay.com* and *www.youthresources.com,* intended to establish connection to those sites by which other students could readily view the information contained on those sites. By clicking on the button, the visitor appears to simply go to another page of information maintained by GAP Youth. The only distinction is that the entity extending to the user the option of reading and viewing the sexually explicit material is the transferee site rather than GAP Youth/LGSA. The Court finds such a distinction too tenuous to make a difference with regard to Plaintiffs' argument. The Court further finds that the information, regardless of its true source, does not appear to be distinct from the group's website. Caudillo clearly intended for visitors to the GAP Youth site to be directed to such information. *See* Caudillo Dep. p. 133 at ln. 21–25. The Court makes a finding of fact that the information contained on the group's website was 1) lewd, 2) indecent, and 3) obscene under the applicable constitutional three-prong test of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). "When triers of fact are asked to decide whether 'the average person, applying contemporary community standards' would consider certain materials 'prurient,' it would be unrealistic to require that the answer be based on some abstract formulation. The adversary system ... has historically permitted triers of fact to draw on the standards of their community...." *Id.* at 30, 93 S.Ct. 2607. Thus, the Court further finds that it was highly inappropriate to be directing the attention of young students toward such material by way of promotion of the website on the school campus.

Plaintiffs also attempt to assert that groups expressing anti-homosexual viewpoints are allowed to express those viewpoints on campus at their meetings. In support of this assertion, Plaintiffs allege that the national association of Fellowship of Christian Athletes requires its minister leaders to check a box either agreeing or disagreeing that "[n]either heterosexual sex outside of marriage nor any homosexual act constitute [sic] an alternative lifestyle acceptable to God." *See* Pl.App. p. 100. The Court notes that just because those desiring to be leaders in the Fellowship of Christian Athletes are re-

quested to check the box, no evidence exists that students who are only members of the group must make such an assertion, or even that someone desiring to be a leader is required to agree in the affirmative with the statement. Plaintiffs, however, failed to produce any evidence that viewpoints involving the subject matter of sex were in fact expressed on the campuses of LISD in violation of its subject-matter restrictions. Nor have Plaintiffs produced any evidence showing that the student members of the Fellowship of Christian Athletes ever professed any anti-homosexual or pro-heterosexual viewpoints on campus. Such a failure to produce any evidence of discussions involving sexual content is fatal to Plaintiffs' assertion. Defendant LISD has a policy that excludes discussion of sexual content of both heterosexual and homosexual views. No evidence exists that would allow this Court to conclude that one viewpoint was allowed while the other viewpoint was denied.

Defendant Hardin testified in his deposition that, "I know there is a different standard when you're discussing children. And things that are sexual in nature have to be reviewed differently because we're talking about children." *See* Hardin Dep. p. 38 ln. 22–25. At LISD, student groups can be made up of children with ages as young as twelve years old. *See* Aff. of Hardin (stating the ages for minors at LISD secondary schools range from 12–17 years). Not only does this Court agree with his perception, but ample Supreme Court precedence aligns with his view as well. This is a case involving the issue of exposure of minors to material of a sexual subject matter. The Supreme Court, diverging from the *Tinker v. Des Moines Independent Community School Dist.* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) analysis, held that it was appropriate for educators to protect students from sexually explicit, indecent, or lewd speech. The Court was careful to note that "[u]n-

like the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in [*Fraser*] were unrelated to any political viewpoint." *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 442 (5th Cir.2001) (citations omitted) (quoting *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)). Likewise, this Court finds that LISD's exclusion of sexual subject matter is not related to any viewpoint.

The constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings. *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of values is truly the work of the school, and the determination of what manner of speech is inappropriate properly rests with the school board. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 676, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). First Amendment jurisprudence recognizes an interest in protecting minors from exposure to vulgar and offensive spoken language, *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), as well as in imposing limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children, *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). A school district acts entirely within its permissible authority in declaring that indecent speech has no claim to First Amendment protection. *See Bethel Sch. Dist. No. 403*, 478 U.S. 675, 676, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). This is because the same latitude of expression is not required for children in a public school as is required for adults. *Id.* at 682, 106 S.Ct. 3159. The Supreme Court has also found that speech

of an indecent nature in public schools could well be seriously damaging to its less-mature audience, such as to children who were only fourteen years old and on the threshold of awareness of human sexuality. *Id.* at 683, 106 S.Ct. 3159. LISD's secondary schools contain students as young as twelve years of age, even less mature than the age the Supreme Court found to be too immature for such subject matter. Thus, as stated above, this Court finds that the material on GAP Youth/LGSA's website and the group's goal of discussing sex both fall within the purview of speech of an indecent nature, such that LISD may regulate and prohibit such speech from its campuses.

 Plaintiffs also assert that LISD cannot exclude GAP Youth/LGSA based on the school's abstinence-only policy. This Court disagrees. "A school need not tolerate student speech that is inconsistent with its basic educational mission, even though the government could not censor similar speech outside the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (internal quotations and citations omitted). The Court finds that LISD's abstinence-only policy is clearly reasonable, especially when viewed in light of the age group affected; thus, Plaintiffs have failed to meet their burden showing that Defendants violated the group's First Amendment rights by promulgating an abstinence-only policy. Moreover, this Court finds that LISD clearly has a compelling interest in protecting minors from such material. The Court also finds that LISD's restriction is narrowly drawn in light of the compelling interest. Such a

finding of a compelling interest is supported by the Supreme Court's reasoning that reasonable limits exist upon the rights of minors as compared to adults.

The Court long has recognized that the status of minors under the law is unique in many respects.... The unique role in our society of the family, the institution by which we inculcate and pass down many of our most cherished values, moral and cultural, requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children. We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing.

*Bellotti v. Baird*, 443 U.S. 622, 633–34, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (internal quotes and citations omitted).

Notwithstanding the importance the Court always has attached to First Amendment rights, it concluded that even where there is an invasion of protected freedoms the power of the state to control the conduct of children reaches beyond the scope of its authority over adults.

*Id.* at 636, 99 S.Ct. 3035 (internal quotes and citations omitted).

 Some forms of expression are not appropriate in certain settings, whereas the same form of expression may be protected speech in another setting.[6] LISD has adopted a policy that limited a complete subject matter and barred its

6. Plaintiffs argue that allowing the group to meet on campus would likely not be perceived as bearing the imprimatur of the school. Supreme Court precedence supports such a conclusion. *See Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250, 110 S.Ct.

2356, 110 L.Ed.2d 191 (1990). However, GAP Youth/LGSA also requested to use the school's P.A. system and to post its fliers on school property, which would occur during school hours. The precedence is not so clear on whether such use of school equipment and

discussion from the forum of its campuses, i.e., sexual activity and conduct as well as birth control methods other than abstinence. GAP Youth/LGSA's stated goals clearly included discussing banned subject matter. Plaintiff Caudillo obviously understood that such a ban existed. *See* Caudillo Dep. p. 115 at ln. 21–22. Moreover, the joint stipulation of facts concedes as much. The Court finds that such a policy indeed exists at LISD. Furthermore, the Court finds that the stated goal of discussing sexual conduct was in direct contradiction to the reasonable subject-matter limitations imposed upon the school's forum.

The Court finds that in light of the purpose served by the forum, the policy restricting any discussion of sexual activity and birth control other than abstinence does not violate the First Amendment. The Court further finds that the restriction is clearly permissible in that it is "reasonable in light of the purpose served by the forum." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. The forum was reserved for students and student groups. Subject matter of a sexual content in a limited public forum is clearly excludable if reasonable. The Court finds that GAP Youth/LGSA clearly listed as one of its goals that it would discuss safe sex. *See* Def.App. pp. 594, 718 goal No. 6. The group wished to promote its goals and website over the school's P.A. system, by way of fliers posted or handed out in the school, and later

by meeting on the school's campus. Each would have exposed minors, some as young as twelve years old, to a subject matter that was banned from the LISD campuses and inappropriate for the age groups affected. The Court finds that the LISD campus is not the appropriate setting for such subject matter and LISD has a compelling interest in preventing such subject matter from its campuses. Listing as a goal the discussion of safe sex and advertising a website address with links to obscene and explicit sexual conduct go beyond the bounds of First Amendment protection in the public school setting.

## EQUAL ACCESS ACT

Plaintiffs also assert claims that Defendants violated their Equal Access Act rights. Defendants admit that LISD maintains a limited open forum as defined under the EAA. The following is the relevant portion of the EAA:

It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a).

Here, Defendants allege that they relied upon exceptions to the Equal Access Act

facilities during school hours could be perceived as bearing the imprimatur of the school unless the school takes clear and specific steps to ensure that the students do not misperceive school endorsement or support. *See id.* at 251, 110 S.Ct. 2356. No evidence was presented by the parties in this suit as to how LISD might clearly remove any inference of endorsement. The *Mergens* court also acknowledged that the EAA preserves the school's authority to maintain order and discipline and assure that "attendance of students at meetings is voluntary." *Id.* at 241,

110 S.Ct. 2356. Section 4071(d)(2) expressly provides that nothing in the EAA shall be construed to authorize any State "to require any person to participate...." If the fliers and P.A. announcement were to be interpreted to constitute "meetings" under the EAA, then all students would be required to walk past the fliers several times daily or hear the announcements during class time. Such conduct would not be limited to "noninstructional time" nor would it be "voluntary" attendance as is required by the EAA.

and upon Supreme Court precedent that excluded discussion of sexual topics from First Amendment protection on campuses of secondary education. This Court has found no case law within this circuit or from the Supreme Court defining the boundaries of the exceptions to the EAA under such circumstances as the facts of this case present.[7] However, the EAA has been interpreted to allow some viewpoint-neutral restrictions on student speech. "Because the Court interprets the language of the EAA to *permit a school to impose reasonable content-neutral regulations* on a limited open forum, the Court will consider the Defendants' argument as being applicable to the EAA as well." *Franklin Cent. Gay/Straight Alliance v. Franklin Tp. Cmty. Sch. Corp.*, 2002 WL 32097530, *19 (S.D.Ind.2002) (emphasis added). "[T]he Court notes that the language of the EAA prohibits discrimination on the basis of content. That suggests that if the school treated all clubs the same with respect to the issue in question, the regulation of content might be permissible." *Id.* Such a view is supported in the following statement.

> I believe we must probe more deeply to avoid a patently bizarre result. Can Congress really have intended to issue an order to every public school in the Nation stating, in substance, that if you sponsor [clubs] without having formal classes in those subjects-you must also open your doors to every religious, political, or social organization, no matter how controversial or distasteful its views may be? I think not. A fair review of

the legislative history of the [EAA] discloses that Congress intended to recognize a much narrower forum....

*Westside Cmty. Bd. of Educ. v. Mergens,* 496 U.S. 226, 271, 110 S.Ct. 2356, 110 L.Ed.2d 191 (Stevens, J., dissenting).

### *Maintaining–Order–and–Discipline Exception to the EAA*

■ Defendants assert that they relied on the exceptions to the EAA for avoiding disruptions to the school setting.

> [T]he meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school....

20 U.S.C. § 4071(c)(4).

> Nothing in this subchapter shall be construed to limit the authority of the school, its agents or employees, *to maintain order and discipline* on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary.

20 U.S.C. § 4071(f) (emphasis added).

In maintaining order and discipline, Defendants stated that they considered the then current criminal laws of Texas and determined that they could not allow a group to meet on campus that promoted discussions which, at their heart, advocated the violation of state law. Defendants contend that allowing clubs based upon sexual activity, be it homosexual or heterosexual activity, would be encouraging direct contravention of Texas laws. Defen-

---

**7.** The Court was directed to *Clark v. Dallas Indep. Sch. Dist.,* 806 F.Supp. 116 (N.D.Tex. 1992), where students' attempts to distribute religious tracts were held not to fall within the scope of the EAA as plaintiffs were not attempting to hold a "meeting" covered by the EAA. *Id.* at 120.

The *Mergens* court specifically acknowledged that the EAA does not limit a school's

ability to prohibit meetings that would "materially and substantially interfere with the orderly conduct of educational activities within the school." *Mergens,* 496 U.S. at 241, 110 S.Ct. 2356. However, that opinion did not address the specifics required to meet that standard, nor did it address the exception relating to the well-being of the students.

dants believed that to do so would be in contradiction of maintaining order and discipline as well as contradicting the students' well-being. At the time of the requests, Texas law banned sexual acts between homosexuals. *See* Tex. Penal Code Ann. § 21.06 (Vernon 2003).[8] Texas law also made it a crime for minors to engage in sexual acts if they were of the same sex, or if they were of opposite sex and more than three years apart in age. *See* Tex. Penal Code Ann. § 21.11(a) (Vernon 2003).[9] Defendants submit that the second-cited Texas statute shows the State's compelling interest in preventing groups based upon sex, sexual content, and sexual activity from gaining recognition in public schools. Defendants' assertion is based upon the logic that the group's meetings and discussions would substantially and materially interfere with the orderly conduct of the school's educational activities within the school. Defendants argue that by allowing the group to meet and discuss subjects banned from the educational activities and campus setting, GAP Youth/LGSA would cause material interference with LISD's abstinence-only policy. Defendants also seem to rely upon the EAA's defense for unlawful conduct in that the goal of discussing sex and the material contained on the website promote sexual activity between minors, which is illegal if between minors of the same sex or between minors of opposite sex and more than three years apart in age.

> Nothing in this subchapter shall be construed to authorize the United States or any State or political subdivision thereof-to sanction meetings that are otherwise unlawful.

20 U.S.C. § 4071(d)(5).

Defendants direct this Court's attention to the Congressional Record of the Senate in addressing this very issue. Senator Hatfield stated, "[S]ome States have laws that prohibit actions of homosexuals. You cannot bring in an outside organization that is advocating or establishing some kind of purpose to violate laws of those States." *See* 130 Cong. Rec. 19,224 (1984) (statement of Sen. Hatfield in support of amendment he brought to the floor and which was codified as 20 U.S.C. § 4071(f)). Plaintiffs, however, argue that there is a distinction between discussing illegal conduct and actually committing the illegal conduct. Plaintiffs' argument, like Defendants' argument, is also supported in the Congressional Record.[10]

> So if a group wanted to use the facilities for a peaceful meeting, I read this language to say that the school board would have absolutely no authority to deny them that right, and if some group advocating gay rights wanted to use the school, it would appear very clear that

---

8. Subsequent to the facts giving rise to this case, the Texas sodomy law has been declared unconstitutional by the United States Supreme Court. *See Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

9. Although Plaintiffs argue that a case in Kansas challenging the constitutionality of a similar law was remanded by the United States Supreme Court following its ruling in *Lawrence v. Texas,* the Court of Appeals of Kansas has determined that the Kansas statute is constitutional. The Court of Appeals of Kansas seemed to distinguish a statute applied to minors from the *Lawrence v. Texas* decision in

which the U.S. Supreme Court referenced adults. *See Kansas v. Limon,* 32 Kan.App.2d 369, 83 P.3d 229 (2004) (citing *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508, for the distinction made by the Justices that the *Lawrence* case did not involve minors).

10. Because both parties' arguments are supported by the Congressional Record, the Record is of little help to this Court. However, upon review of the Congressional Record, this Court notes that Senator Hatfield was the one who brought forward the amendment for maintaining order and discipline to the floor.

there would be no right to deny them those facilities.... I am not even certain that you can make a distinction between those States that make homosexual activities illegal and those that make homosexual activities legal, because, we have recognized that people can speak out with respect to various issues whether or not they are actually involved in committing acts that are prohibited.... I think the issue is this: Can a school board stop some groups from using their facilities? Unless an organization is there to be disruptive or to break the law, I read the language of this proposal as saying that they cannot.

130 Cong. Rec. 19226 (1984) (statement of Sen. Metzenbaum).

Plaintiffs contend that the Texas statutes cited to by Defendants address conduct and not speech and thus have no bearing on the group's right to discuss such material. Plaintiffs cite to Fifth Circuit precedent for the proposition that "speculation that individuals might at some time engage in illegal activity is insufficient to justify regulation by the state." See Gay Student Servs. v. Texas A & M Univ., 737 F.2d 1317, 1329 (5th Cir.1984). Plaintiffs also argue that Defendants have not shown that the students' mere discussion of the illegal activity would incite or produce imminent illegal activity. Plaintiffs rely on a recent Supreme Court case for the same proposition:

> The government may not prohibit speech because it increases the chance an unlawful act will be committed "at some indefinite future time." Hess v. Indiana, 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (per curiam). The government may suppress speech for advocating the use of force or a violation of law only if "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg

v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam).

Ashcroft v. Free Speech Coalition, 535 U.S. 234, 253–254, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).

Defendants counter that the cases relied upon by the Plaintiffs dealt with adults and that the law clearly recognizes distinctions for minors. Such an argument is supported by the statement: "The potential for undue influence is far less significant with regard to college students who voluntarily enroll in courses. This distinction warrants a difference in constitutional results." Edwards v. Aguillard, 482 U.S. 578, 584 n. 5, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (internal quotes and citations omitted). Defendants assert that the fact minors are involved is especially relevant in the context of sex and sexual subject matter. Defendants again direct this Court's attention to the Senate's Record of the debate relating to the EAA in which the question was posed whether a school may "prohibit the formation of a student organization in spite of the limited open forum, even though that student organization is only going to engage in talk and not in any form of action or physical disruption whatsoever." Senator Hatfield answered, "The answer to the Senator's question is 'yes'...." See 130 Cong. Rec. 19,224 (1984) (statement of Sen. Hatfield in support of the amendment he brought to the floor, eventually codified as § 4071(f)). The statements made by Senator Hatfield, who co-authored the EAA and brought the § 4071(f) amendment to the floor, clearly shows that the EAA allows exceptions in factual circumstances such as this case presents. However, this Court will not base, on congressional intent alone, its decision that Defendants did not violate the EAA. Defendants make other arguments that are more persuasive.

■ Defendants also argue that substantial disruption to the educational mission of the school was highly likely if the Defendants granted GAP Youth/LGSA's requests. In *Mergens,* the Court noted that "[t]he Act expressly does not limit a school's authority to prohibit meetings that would 'materially and substantially interfere with the orderly conduct of educational activities within the school.'" *Mergens,* 496 U.S. at 241, 110 S.Ct. 2356. Courts have used this phrase to describe the type of speech that can be prohibited by a school under the EAA. If a type of speech creates a genuine safety concern or interrupts or interferes with the teaching of curriculum, then it would "materially and substantially interfere" with the school functions and may thus be restricted. Here, LISD has a curriculum that is void of discussing sexual conduct. The group's speech, according to its stated goals, would clearly contradict the District's abstinence-only curriculum. Thus, logically, the GAP Youth/LGSA's speech creates a "material and substantial" interference with LISD's educational mission and function in that it contravenes LISD's abstinence-only policies and curriculum.

■ As stated above, no precedence exists in this circuit or from the Supreme Court interpreting the bounds of the exceptions from coverage under the EAA in a situation such as the Court confronts in this case. Thus, this Court will look to similar precedent. The "reasonable forecast" of disruption that might result from the exercise of expression is a difficult standard to apply. *Shanley v. Northeast Indep. Sch. Dist., Bexar County,* 462 F.2d 960, 970 (5th Cir.1972). It is not necessary that the school administration stay a reasonable exercise of restraint until disruption actually occurs. *Butts v. Dallas Indep. Sch. Dist.,* 436 F.2d 728, 731 (5th Cir.1971). Nor does the Constitution require a specific rule regarding every permutation of student conduct before a school administration may act reasonably to prevent disruption. *Shanley,* 462 F.2d at 970. The Fifth Circuit has stated that

> we do not here delimit the categories of materials for which a high school administration may exercise a reasonable prior restraint of content to only those materials obscene, libelous, or inflammatory, for we realize that specific problems will require individual and specific judgments. Therefore, in deference to the judgment of the school boards, we refer ad hoc resolution of these issues to the neutral corner of "reasonableness."

*Id.* at 971. There must be demonstrable factors that would give rise to any reasonable forecast by the school administration of substantial and material disruption of school activities before expression may be constitutionally restrained. *Id.* at 974. However, "it is not at all unusual to allow the geographical location of the actor to determine the constitutional protection that should be afforded to his or her acts." *Id.* Here, the geographic location of the actor(s) is the public school campuses of LISD. Thus, the Court finds that the Defendants made a reasonable forecast of disruption considering the circumstances of this case and the location of the actors.

■ In support of their argument that public secondary schools are a distinct location for which special circumstances exist, Defendants also point to federal law that demands that the school prevent harassment to its students, including harassment for sexual orientation. *See* Title IX, 20 U.S.C. § 1681(a). The Court finds this argument to have merit. Groups and plaintiffs across the country have supported lawsuits seeking to impose liability for harassment based upon sexual orientation. Although Plaintiffs contend that denial based upon a "heckler's veto" is not allowed under such a standard, ample case law exists that shows a school can be held

liable for such harassment if the officials were complacent in letting it occur. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Schools are caught in a conundrum. If a school allows a group to meet under circumstances which the school reasonably knew or should have known would cause harassment and safety problems, then the school will be attacked through lawsuits by the injured parties and by outside groups. If a school denies activities in order to prevent such outcomes, then it faces a suit similar to the instant suit before this Court. This Court believes that a school that chooses to prevent activities that invite harassment, safety problems, and lawsuits has chosen the wiser of the two possibilities.

 The Court is aware that courts in other circuits have adopted the view that the EAA incorporated the *Tinker* rule that the disruption must "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *See Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 870 (2d Cir.1996). Although § 4071(c) somewhat tracks the *Tinker* language, this Court does not believe that the EAA requires such a substantial showing of interference under other exceptions. For instance, § 4071(f) does not track the *Tinker* language. Moreover, other circuits have determined that a school may prevent student expression that might invite a lawsuit or incite conflicts among students without violating the EAA. *Gernetzke v. Kenosha Unified Sch. Dist.*, 274 F.3d 464 (7th Cir. 2001).

> [The principal's denial] was in any event insulated from liability under the Act by the provision that "nothing in [the EAA] shall be construed to limit the authority of the school ... to maintain order and discipline on school premises." 20 U.S.C. § 4071(f). It is true that to sup-

press expression on the basis of the angry reaction that it may generate is precisely what the "heckler's veto" cases [*Tinker,* etc.] forbid in the name of the free-speech clause of the First Amendment. But the "order and discipline" defense that we just quoted suggests that the principle of those cases has not been carried over into the Equal Access Act. And anyway the First Amendment has been sensibly interpreted to allow school authorities greater control over the free speech of students than the state is permitted to exercise over the free speech of adults engaged in political expression in the normal venues.... Order and discipline are part of any high school's basic educational mission; without them, there is no education.

*Gernetzke,* 274 F.3d at 467 (Posner, J.).

In the instant case, it seems that one of the circumstances upon which the Defendants were relying is the fact that phone calls had been placed to the Central Office "express[ing] concern on the telephone about those students and their safety." *See* Hardin Dep. p. 45–46. This Court agrees with the words of Judge Posner in *Gernetzke* when he stated,

> We pause here to express our doubts about the appropriateness of litigation that is intended ... to wrest the day-to-day control of our troubled public schools from school administrators and hand it over to judges and jurors who lack both knowledge of and responsibility for the operation of the public schools.

*Gernetzke,* 274 F.3d at 467. Here, LISD officials relied on their years of experience in the realm of public education to make a judgment call as to the safety of the students. Defendants argue that a potential for sexual-orientation harassment existed on LISD campuses that could lead to disruptive and dangerous conditions for the

students. *See* Def.App. p. 672. The Court finds that in the opinion of those with years of experience, whose consideration included the circumstances of the anonymous phone calls, legitimate safety concerns existed as well as concerns for harassment.

For all the above-stated reasons and findings, the Court thus finds that a school is clearly within its rights in invoking the maintaining-order-and-discipline exceptions to the EAA. More specifically, the Court finds that Defendants in this case, especially under the circumstances, were clearly within the boundaries of the exclusions from the EAA in denying GAP Youth/LGSA's requests in an effort to maintain order and discipline on the campuses of LISD.

## Well–being–of–the–Students Defense to the EAA

■ Perhaps the most compelling argument advanced by the Defendants is that the State has a compelling interest in protecting the students' mental and physical health and well-being. As such the Defendants argue that the stated goals of GAP Youth/LGSA and the material on the group's website, which they wished to promote by way of advertising the web address, directly endanger the well-being of the students in multiple respects.

The school has been delegated the primary responsibility of overseeing the students' well-being while on school premises. Within that context, the school and its faculty are duty-bound to ensure the physical, mental, and emotional well-being of the students within its care and on its campus. Defendants submit that the State has a compelling interest in protecting students from teen pregnancy, sexually transmitted diseases, and the harms associated with sexual activity and minors. Defendants also argue that the school has a compelling interest in protecting students from the obscene and inappropriate

material presented on GAP Youth's website. The Defendants allege that the State's compelling interest is even stronger in instances where sexual activity is illegal for minors. Defendants again rely upon exceptions to the EAA's coverage:

> Nothing in this subchapter shall be construed to limit the authority of the school, its agents or employees, to maintain order and discipline on school premises, *to protect the well-being of students and faculty,* and to assure that attendance of students at meetings is voluntary.

20 U.S.C. § 4071(f) (emphasis added).

The Supreme Court has emphasized that the nature of a school's power over the students is custodial and tutelary, *permitting a degree of supervision and control* that could not be exercised over free adults. *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (emphasis added). A proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. *Id.* (internal quotes and citations omitted). Additionally, the Supreme Court has acknowledged that for many purposes "school authorities act[ ] *in loco parentis.*" *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 684, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). The Supreme Court has further recognized that schools have a responsibility for children's well-being in that "[u]nder the Constitution, the State can properly conclude that parents and others, *teachers for example, who have the primary responsibility for children's well-being* are entitled to the support of laws designed to aid discharge of that responsibility." *Bellotti,* 443 U.S. at 639, 99 S.Ct. 3035 (emphasis added) (internal quotes and citations omitted). The Texas Family Code also recog-

nizes the responsibility that schools have for a minor's "care, custody, or welfare." *See* Tex. Fam.Code Ann. § 262.001(5)(D) (Vernon 2002). "Thus, while children assuredly do not 'shed their constitutional rights ... at the schoolhouse gate,' the nature of those rights is *what is appropriate for children in school.*" *Vernonia School Dist. 47J*, 515 U.S. at 656, 115 S.Ct. 2386 (emphasis added) (internal citation omitted).

▮ In again looking to the intent of the drafters, the well-being exception to the EAA was clearly drafted for precisely the situation confronted by Defendants in this case.

> But that is the intention of the amendment [20 U.S.C. § 4071(f)], to try to provide the school administration with the power to prevent the abuse of this freedom, and to try to prevent the interference with the psychological welfare or the well-being of the kids.

*See* 130 Cong. Rec. 19,229 (1984) (statement of Sen. Danforth in support of the "Danforth Amendment" eventually codified as § 4071(f)). It cannot be logically argued that the school did not have a compelling interest in maintaining the students' well-being. The Court finds that the compelling interest includes protecting students from teen pregnancy, sexually transmitted diseases, the harms associated with sexual activity and minors, and the harms associated with exposing minors to sexual subject matters. Moreover, the Texas Family Code specifically recognizes that minors should not be exposed to conditions or surroundings that endanger their physical or emotional well-being. *See* Tex. Fam.Code Ann. §§ 161.001(D) & (E) (Vernon 2002).

Thus, the Court finds that the Defendants properly invoked the "well-being exception" to the EAA in denying the GAP Youth/LGSA requests as presented to the Defendants. The Defendants properly considered the effects of exposing minors to sexual subject matter and materials and how that could be detrimental to the students' physical, mental, and emotional well-being. The Court finds that students should not be exposed to the type of material that was available on the group's website. The logical conclusion of allowing the direct promotion of GAP Youth's website on campus is that such advancement would lead to the exposure of minors to the material. Moreover, discussing sexual activity, as was intended by the group from a review of its proposed goals, again leads to the logical conclusion that minors would be exposed to subject matter that is detrimental to their physical, mental, and emotional well-being.

### *CONCLUSION*

As stated in *Bethel*, "Justice Black, dissenting in *Tinker*, made a point that is especially relevant in this case: 'I wish therefore, ... to disclaim any purpose ... to hold that the Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public school system to public school students.' " *Bethel*, 478 U.S. at 686, 106 S.Ct. 3159 (citing *Tinker*, 393 U.S. at 526, 89 S.Ct. 733). Plaintiffs submitted proposals to post and hand out fliers on the campus of Lubbock High School, use the P.A. system during school hours, and eventually to meet on campus and be recognized as a student group. This Court finds that, as presented to the Defendants, Plaintiffs' proposed goals violated well-known LISD policies banning discussion of sex and sexual acts. Furthermore, the Court finds that, as presented to Defendants, GAP Youth/LGSA's website contained links to obscene and highly inappropriate materials for students of such a tender age. No evidence has been presented that the group removed stated goals that violated well-known LISD policy

or that the group removed the links from its website and then re-submitted requests to the Defendants. The Court finds that at all times that the group made requests of the Defendants and were denied, the group had submitted as one of its goals the discussion of banned subject matter and maintained links on its website to obscene and inappropriate materials. The Court finds that neither First Amendment nor EAA rights trump the rights of a school district, who stands in the place of a student's parent, to reasonably prohibit sexual material and discussions of sexual acts from its campus in an effort to maintain order, discipline, and the students' well-being.

In summation, this case has nothing to do with a denial of rights to students because of their sexual viewpoints. It is instead an assertion of a school's right not to surrender control of the public school system to students and erode a community's standard of what subject matter is considered obscene and inappropriate. At some point, a line must be drawn that considers the proper subject matter allowed in the schools of this country. The effects of exposing minors to sexual material before they are mature enough to understand its consequences and far-reaching psychological ramifications compels a school district to step in and draw such a line.

This case is simply about a school district's ability to control sexual subject matter on its campus. This Court believes that the Defendants would have acted in precisely the same manner had a group with a core directive to promote heterosexual views and discussions attempted to hand out or post fliers with a website that contained highly sexual content. Moreover, had any group blatantly asserted to the District's Board that it maintained a stated goal in direct contravention of LISD policy, the Court finds that such a group would have been denied its request as well.

"[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). The Court is of the opinion that the local school officials and parents are in the best position to determine what subject matter is reasonable and will be allowed on LISD campuses in order to protect the well-being of the students and maintain order and discipline. Families entrust public schools with the education of their children, but condition their trust on the understanding that the school setting will not purposely be used to advance views that may conflict with the private beliefs of the student's family. *Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). Students in such institutions are impressionable, vulnerable, and often unable to make critical decisions in an informed, mature manner. Thus, constitutional principles will be applied with sensitivity and flexibility to the special needs of parents and children. Defendants did not violate the Plaintiffs' First Amendment right of free speech. Furthermore, no violation of the EAA occurred because, under the circumstances of this case, the Defendants properly invoked exclusions and exceptions under the Act. Therefore, Defendants' Motion for Summary Judgment is well taken and **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**.

SO ORDERED.